IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. DELGADO

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

JAMES DELGADO, APPELLANT.

Filed June 6, 2017.    No. A-16-662.

Appeal from the District Court for Scotts Bluff County: RANDALL L. LIPPSTREU, Judge. Affirmed.

Robert W. Kortus, of Nebraska Commission on Public Advocacy, for appellant.

Douglas J. Peterson, Attorney General, and Kimberly A. Klein for appellee.

MOORE, Chief Judge, and INBODY and RIEDMANN, Judges.

INBODY, Judge.

## I. INTRODUCTION

James Delgado appeals from the Scotts Bluff County District Court's denial of his petition for postconviction relief following an evidentiary hearing. For the reasons set forth herein, we affirm.

## II. STATEMENT OF FACTS

In 2007, Delgado was convicted of sexual assault of a minor and a jury trial was held, during which he was represented by William Madelung. Delgado was sentenced to 24 to 36 years' imprisonment.

The district court's factual background as set forth in its postconviction order states that:

Monday, April 9, 2007, was a non-school day at Gering High School. At approximately 8:00 [a.m.] on that day Cheryl D[.] took her fifteen year old daughter [J.D.]

to stay with "Uncle Alfred" while Cheryl went to work. At the time Delgado was 54 years old and residing with Uncle Alfred. Later that same morning Delgado borrowed Uncle Alfred's van and had [J.D.] drive him one or more times to a liquor store where he purchased beer and Southern Comfort. The two then drove around for part of the afternoon drinking the alcohol. At some point in time [J.D.] became quite drunk and vomited. Delgado took her to the Super 8 Motel where he rented a room. The motel manager confirmed that on April 9, 2007, between 1:00 [p.m.] and 1:45 [p.m.] she rented a room to Delgado. [J.D.]'s next memory was waking up in a motel bed wearing no pants or underwear. Delgado was also present in the motel room. According to [J.D.] Delgado told her they had had sex numerous times. She stated that he also "kept sticking his fingers inside of [her] and [she] kept pushing his hand away." That same evening Cheryl [] tried numerous times to contact [J.D.] without success. She eventually contacted the police to report [J.D.] was missing. At approximately 7:00 [p.m.] [J.D.] returned to Uncle Alfred's residence where she was contacted by Officer William Howton.

The following morning Cheryl took [J.D.] to see Michelle Cheloha, M.D. As a standard practice Dr. Cheloha contacted law enforcement to report a possible sexual assault. Officer Joe Rohrer responded with a sexual assault kit.

A warrant was eventually issued to arrest Delgado. He was arrested for sexual assault on April 10, 2007, at approximately 7:00 [p.m.] He was interviewed that same evening at the Scottsbluff Police Department by [Officer] Rohrer. Delgado initially stated [J.D.] drove him to Sidney and nothing more occurred. On further inquiry Delgado admitted that he provided alcohol to [J.D.]; that when they returned from Sidney [J.D.] went to Uncle Alfred's home while he stayed with his friend Rubago; but that [J.D.] was not drunk. On further inquiry Delgado admitted getting a motel room because [J.D.] was drunk. He said he put her in bed and then sat in a chair while she slept. On further inquiry Delgado said [J.D.] puked on her pants so he took them off to clean them. Several times when [Officer] Rohrer took a break Delgado made attempts to leave the interview room or the police station. Delgado denied touching [J.D.] "in any inappropriate way".

Delgado did not testify at trial. [J.D.]'s claim that Delgado told her they had had sex was never expressly contradicted. It was unclear from the evidence when or why Delgado removed [J.D.]'s underwear in addition to her pants.

On April 10, 2007, at approximately 1:30 [p.m.] the motel room was searched. Numerous empty beer cans, an empty 12-pack beer carton, and an empty Southern Comfort bottle were located and seized.

On direct appeal, Delgado was represented by Leonard Tabor and contended that the evidence was insufficient to support his conviction and that his sentence was excessive. The State then filed a motion for summary affirmance, which we granted.

Subsequently, Delgado filed a motion for postconviction relief, which he later amended. In February 2016, the district court held an evidentiary hearing regarding Delgado's amended motion for postconviction relief. Delgado presented evidence via the following depositions: Dr. Jenna Fiala, Madelung, Tabor, and Delgado. The district court also received the bill of exceptions

of the trial proceedings in Delgado's case. For brevity, the relevant evidence will be included in the analysis portion of this opinion.

Following the hearing, the district court ordered the parties to submit written briefs in support of their positions. Upon review of the parties' briefs, the district court denied Delgado's motion for postconviction relief.

## III. ASSIGNMENTS OF ERROR

On appeal, Delgado's assignments of error, consolidated and restated are that the district court erroneously denied postconviction relief and that the district court erroneously held that his Sixth Amendment right to effective assistance of trial counsel was not violated when trial counsel failed to consult an expert medical witness to counter the State's expert testimony, did not seek to exclude or limit the State's expert testimony, failed to object to a law enforcement officer's testimony regarding Delgado's truthfulness during interrogation, and failed to offer favorable DNA evidence at trial. Delgado also alleges the district court erroneously held that his Sixth Amendment right to effective assistance of direct appeal counsel was not violated when his direct appeal counsel failed to raise the challenges listed above on direct appeal.

## IV. STANDARD OF REVIEW

A defendant requesting postconviction relief must establish the basis for such relief, and the findings of the district court will not be disturbed unless they are clearly erroneous. In appeals from postconviction proceedings, we review de novo a determination that the defendant failed to allege sufficient facts to demonstrate a violation of his or her constitutional rights or that the record and files affirmatively show that the defendant is entitled to no relief. Whether a claim raised in a postconviction proceeding is procedurally barred is a question of law. When reviewing questions of law, an appellate court resolves the questions independently of the lower court's conclusion. *State v. Williams*, 295 Neb. 575, 889 N.W.2d 99 (2017).

## V. ANALYSIS

In order to establish a right to postconviction relief based on an ineffective assistance of counsel claim, the defendant has the burden, in accordance with *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), to show that counsel's performance was deficient; that is, counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *State v. Armendariz*, 289 Neb. 896, 857 N.W.2d 775 (2015). Next, the defendant must show that counsel's deficient performance prejudiced the defense in his or her case. *Id*. To establish the prejudice element of the *Strickland* test, a defendant must show that the counsel's deficient performance was of such gravity to render the result of the trial unreliable or the proceeding fundamentally unfair. *State v. Dubray*, 294 Neb. 937, 885 N.W.2d 540 (2016). Such prejudice is shown by establishing that but for the counsel's deficient performance, there is a reasonable probability that the case's outcome would have been different. *Id*. The two prongs of this test, deficient performance and prejudice, may be addressed in either order. *State v. Armendariz, supra*. The entire ineffective analysis is viewed with a strong presumption that counsel's actions were reasonable. *Id*.

## 1. Trial Counsel

A motion for postconviction relief asserting ineffective assistance of trial counsel is procedurally barred when: (1) the defendant was represented by different counsel on direct appeal than at trial; (2) an ineffective assistance of trial counsel claim was not brought on direct appeal; and (3) the alleged deficiencies in trial counsel's performance were known to the defendant or apparent from the record. *State v. Williams, supra*. A defendant cannot secure review of issues which were or could have been litigated on direct appeal on a motion for postconviction relief. *Id*. When claims of a trial counsel's performance are procedurally barred, we examine claims regarding trial counsel's performance only if the defendant assigns as error that appellate counsel was ineffective for failing to raise trial counsel's performance. *State v. Duncan*, 278 Neb. 1006, 775 N.W.2d 922 (2009).

In this instance, Delgado was represented by different counsel on direct appeal than at the time of trial. On direct appeal, Delgado did not raise any ineffective assistance of trial counsel arguments. All of Delgado's allegations of ineffective assistance of trial counsel could have been raised on direct appeal, as he had different appellate counsel than trial counsel. Consequently, Delgado's ineffective assistance of trial counsel claims are procedurally barred.

## 2. Appellate Counsel

When analyzing a claim of ineffective assistance of appellate counsel, courts usually begin by determining whether appellate counsel failed to bring a claim on appeal that actually prejudiced the defendant. *State v. Huston*, 291 Neb. 708, 868 N.W.2d 766 (2015). That is, courts begin by assessing the strength of the claim appellate counsel failed to raise. *Id*. Counsel's failure to raise an issue on appeal could be ineffective assistance only if there is a reasonable probability that inclusion of the issue would have changed the appeal's result. *Id*. When a case presents layered ineffectiveness claims, we determine the prejudice prong of appellate counsel's performance by focusing on whether trial counsel was ineffective under the *Strickland* standard. *Id*. If trial counsel was not ineffective, then the defendant suffered no prejudice when appellant counsel failed to bring an ineffective assistance of trial counsel claim. *Id*.

### (a) Failure to Consult Expert Medical Witness

Delgado contends the district court erroneously determined that his right to "effective assistance of trial and direct appeal counsel was not violated in respect to whether said counsel rendered constitutionally deficient performance by failing to consult with and secure the services of an expert medical witness to counter the State's expert testimony and the failure to properly challenge this testimony at trial and on direct appeal." Brief for appellant at 2-3.

At the district court level during the postconviction proceedings, Delgado's postconviction counsel provided the deposition of Dr. Fiala, who reviewed Dr. Cheloha's determinations. In its order, the district court outlined Dr. Fiala's testimony, including the similarities and differences with Dr. Cheloha's determinations. The district court noted the differences between the doctors' testimonies and called attention to the fact that Dr. Cheloha personally examined the victim. However, the district court ultimately concluded that Delgado's trial counsel's decision not to call an expert witness was trial strategy.

- 4 -

When an appellate court reviews claims of alleged ineffective assistance of counsel, it affords trial counsel due deference to formulate trial strategy and tactics. *State v. Torres*, 295 Neb. 830, ___ N.W.2d ___ (2017). There is a strong presumption that counsel acted reasonably, and an appellate court will not second-guess reasonable strategic decisions. *Id*. The decision to call, or not to call, a particular witness, made by counsel as a matter of trial strategy, even if that choice proves unproductive, will not, without more, sustain a finding of ineffectiveness of counsel. *Id*.

Delgado's trial counsel indicated the decision not to call an expert medical witness was a matter of trial strategy. In a deposition following trial, Delgado's trial counsel indicated that he believed Dr. Cheloha was "unpersuasive," that she exhibited less than "a fair attitude in regards to the accusation," which consequently caused him to think it was not "especially telling." Trial counsel stated his belief that he reviewed Dr. Cheloha's deposition before trial and spoke with Delgado regarding what the doctor mentioned, he was prepared to cross-examine the doctor at the time of trial, and he believed Dr. Cheloha's testimony would not be determinative. As a result of these factors, Delgado's trial counsel chose not to consult any other medical expert, particularly because "if [Dr. Cheloha] was coming across in front of a jury the same way she was coming across to me at the time of the deposition, I thought that would be helpful." Trial counsel indicated that he believed the jury would conclude that Dr. Cheloha was not objective. Additionally, trial counsel stated that he did not consult a medical expert because he did not believe it was "a crucial part of the case" and "did not wish to get into a battle of experts where the focus [was] going to be . . . on the supposed injury." Trial counsel stated his greater interest was in the reliability of the victim's testimony.

The decision not to call the witness was a reasonable trial strategy by Delgado's counsel at trial. Delgado's trial counsel performed as a lawyer possessing ordinary training and skill in criminal law should by researching and preparing to cross-examine Dr. Cheloha at trial, reviewing Dr. Cheloha's medical reports, and deposing Dr. Cheloha. We agree with the district court's synopsis that trial counsel's strategy was based on "a reasoned conclusion that Dr. Cheloha would present herself as an advocate rather than an impartial medical professional and her testimony would be unpersuasive."

As Delgado's trial counsel was not ineffective for failing to call an expert medical witness, Delgado's appellate counsel was not ineffective for failing to raise the issue on direct appeal.

### (b) Failure to Exclude or Limit Dr. Cheloha's Testimony

Delgado additionally claims the district court erroneously held that his "right to the effective assistance of trial and direct appeal counsel was not violated in respect to whether trial counsel rendered ineffective assistance of counsel by not seeking to exclude or limit the State's expert testimony under a *Daubert/Schafersman* challenge and direct appeal counsel failed to raise this challenge on direct appeal." Brief for appellant at 3. Delgado contends that trial counsel rendered deficient performance by failing to recognize that portions of Dr. Cheloha's testimony were not scientifically valid.

Similar to our analysis above, Delgado's trial counsel's decision not to attempt to limit Dr. Cheloha's testimony was trial counsel's strategy. As mentioned previously, Delgado's trial counsel stated his belief that Dr. Cheloha was unpersuasive, non-objective, and that her testimony would not be determinative. Trial counsel believed that Dr. Cheloha's testimony and demeanor would

actually be "helpful." Further, trial counsel indicated that he chose not to challenge Dr. Cheloha because of his belief that other factors at trial would weigh more importantly to the jury, including the reliability of the victim.

Because Delgado's trial counsel was not ineffective for failing to limit Dr. Cheloha's testimony, Delgado's appellate counsel was not ineffective for failing to raise the issue on direct appeal.

### (c) Failure to Object to Law Enforcement Officer's Testimony

Delgado contends the district court erroneously determined that his right to effective assistance of counsel was not violated when counsel failed "to object to an officer's testimony about the truthfulness of [Delgado] during the custodial interrogation and on the part of direct appeal counsel for failing to challenge the performance of trial counsel in this regard on direct appeal." Brief for appellant at 3.

At trial, Officer Rohrer testified regarding his custodial interrogation of Delgado. Officer Rohrer indicated at trial that when he was questioning Delgado, he inquired further about the incident "because [he] knew [Delgado] wasn't telling [him] the truth" and that he told Delgado that he did not believe Delgado was telling the truth. Later, Officer Rohrer stated that he told Delgado that he "still didn't think [Delgado] was being truthful with [him]."

Specifically, Officer Rohrer's testimony was as follows:

Q. What did he say happened next?

A. He said that she went back to the - to Uncle Alfred's and that he spent the night at a friend's house, some guy named Rubago, and at that time [J.D.] wasn't drunk when she dropped him off at Rubago's.

Q. Did you inquire further?

A. Yes, sir, I did.

Q. Why?

A. Because I knew he wasn't telling me the truth.

Q. What did you do next?

A. Well, I told him that - I said, I don't believe that you're telling me the truth because I know that yesterday you checked into the Super 8 Motel.

A. And he said, well, yeah, I did get a room because [J.D.] was drunk and I didn't want her mom to see her that way so I was going to take care of her.

Q. Did you inquire further?

A. Yes, sir, I did.

Q. What did you ask?

A. I asked him why he would take her to the motel room, he said that he didn't want her to get in trouble. And once they got into the motel room he put her on the bed, cleaned her face and then he just sat in the chair and drank beer while she was sleeping.

Q. What happened next?

A. Well, I told him that - well, I said [J.D.] woke up and her pants weren't on and what happened there? And he said that she had puked on herself and in so doing so had puked on her pants. So he had taken her pants off and washed them in the shower and had

hung them up there. And I told him that I was working on a sexual assault case with [J.D.] and that I had talked with her doctor and the doctor believed -

Mr. Madelung: Objection, hearsay.

The court: Well, overruled. I don't think it's being offered as an assertion but as a question, try to listen and answer, so it will be overruled.

A. And that Dr. Cheloha had told me that [J.D.] had some type of sexual activity the night before. And [Delgado] said, well, he said I didn't touch her. He said I know that she has a boyfriend in Mexico and that she was walking around with him a couple of nights ago down in Gering, because she had told me that. Alls he had done was washed her pants and watched television. And I told him that I still didn't think he was being truthful with me and he just kind of sat there and said, well, I can't figure this out.

In the district court's order regarding the postconviction proceedings, it determined that "[Officer] Rohrer was not expressing an opinion as to Delgado's general credibility--rather, it was focused on the facts of this investigation. [Officer] Rohrer's interview technique was a way to confront Delgado to obtain the true facts of the incident."

The Nebraska Supreme Court recently held that "statements by law enforcement officials on the veracity of the defendant or other witnesses, *made within a recorded interview played for the jury at trial*, are to be analyzed under the ordinary rules of evidence." *State v. Rocha*, 295 Neb. 716, 740, 890 N.W.2d 178, 199 (2017) (emphasis supplied). "If the defendant's statement is itself relevant, then we must consider whether the law enforcement statement is relevant to provide context to the defendant's statement." *Id*. at 741, 890 N.W.2d at 200. "To do this, we consider whether the defendant's statement would be any less probative in the absence of the law enforcement statement. If the law enforcement statement does not make the defendant's statement any more probative, it is not relevant." *Id*. The Supreme Court's decision regarding a law enforcement officer's opinion, particularly statements by a law enforcement officer calling into question a defendant's honesty and stating conclusions about a defendant's guilt, is relevant because it "carries with it the 'imprimatur of the government'", "can induce improper reliance by a jury," and "carries with it a risk of unfair prejudice." *Id*. at 743, 890 N.W.2d at 201.

We initially note the difference from *Rocha* in this instance, is that this is not a recorded conversation between Delgado and Officer Rohrer, but the recitation of the conversation from Officer Rohrer. In *Rocha*, the Supreme Court looked to various other jurisdictions regarding whether credibility statements by law enforcement in a *recorded interview* are admissible, but not a law enforcement officer's own recitation of the conversation.

Neb. Rev. Stat. § 27-106(1)(Reissue 2016) states that:

When part of an act, declaration, conversation or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other. When a letter is read, all other letters on the same subject between the same parties may be given. When a detached act, declaration, conversation or writing is given in evidence, any other act, declaration or writing which is necessary to make it fully understood, or to explain the same, may also be given in evidence.

We agree with the district court's determination regarding Officer Rohrer's testimony that Officer Rohrer was not expressing his opinion about Delgado's credibility, but using an interview technique in a way to confront Delgado to obtain information about what occurred. Officer Rohrer's recitation of his conversation with Delgado provides context as to why Officer Rohrer used such interrogation tactics by telling Delgado that he did not believe him and to obtain more information on what transpired.

In its *Rocha* analysis, the Supreme Court determined that the risk of unfair prejudice in that case was "that the jury could have been influenced, based on [the law enforcement officer's] statements, into believing that Rocha did knowingly possess the methamphetamine and that he was lying when he denied it, even though the statements were not admissible for that purpose." *Rocha*, 295 Neb. at 743-44, 890 N.W.2d at 201. The instant case is distinguishable from *Rocha*. The Court in *Rocha* determined that the jury could have been influenced into believing that Rocha knowingly possessed methamphetamine and was lying when he denied it, whereas Officer Rohrer's statements did not go directly to whether Delgado sexually assaulted a minor, and therefore could not cause a risk of unfair prejudice that the jury could have been influenced into believing that Delgado did sexually assault a minor.

Consequently, Delgado's trial counsel was not ineffective for failing to object to Officer Rohrer's testimony regarding Delgado's truthfulness and Delgado's appellate counsel was not ineffective for failing to raise the issue on direct appeal.

### (d) Failure to Offer Favorable DNA Evidence at Trial

Delgado's final assignment of error is that the district court erred in holding that his right to effective assistance of counsel was not violated when trial counsel failed to offer favorable DNA evidence at trial and direct appeal counsel failed to challenge trial counsel's performance in this regard. Delgado contends his trial counsel chose not to introduce DNA evidence to establish that he was excluded "as the contributor to the sperm fragment located on the teal blanket on the bed in the room he rented at the Super 8 Motel and that his DNA is not detected in any form in the vaginal swabs taken during the SANE examination nor upon the panties of [the victim]". Brief for appellant at 46.

The district court determined that the DNA evidence would have placed Delgado on the motel bed where the victim passed out and that the DNA evidence would have been inconsistent with his statements that after Delgado cleaned up the victim, he sat in a chair, and, therefore, his trial counsel's decision to not use DNA evidence was a tactical decision.

When law enforcement investigated the motel room where Delgado and the victim stayed, law enforcement seized a teal blanket, a pillowcase, and hairs found on the pillowcase, and submitted them for DNA analysis. The DNA testing of the semen stain on the blanket excluded Delgado as a contributor, but a blood stain on the blanket could not exclude Delgado as the single contributor and there was a high probability he was the single contributor. Moreover, two of the hairs in the DNA profile indicated that Delgado was not excluded as a single contributor and showed a very high probability he was the single contributor. Additionally, when Delgado's trial counsel was later deposed about another man's semen being found on the blanket, counsel stated that he thought it did not help them in any way and "[t]he fact that in a motel room there's other sources of semen did not seem to be worth distracting the jury."

- 8 -

Moreover, in reference to Delgado's argument that trial counsel failed to present evidence that his DNA was not detected in any form in the vaginal swabs or upon the victim's panties, such presentation would not have changed the proceeding's result. When Delgado's trial counsel was questioned at the deposition why he chose not to use that evidence at trial, trial counsel responded with "I would have discussed this with . . . Delgado" and that Delgado told him to "[j]ust do what you think is best."

Additionally, we agree with the State's reasoning that "just because [the victim] was penetrated by Delgado does not mean his sperm would be found on the swabs [or] in her panties; he would have to ejaculate to deposit his sperm, and if he did not, then the likelihood of finding sperm is nil." Brief for appellee at 28. Moreover, Neb. Rev. Stat. § 28-318(6) (Reissue 2016) provides that "[s]exual penetration shall not require emission of semen" and the failure for trial counsel to present the absence of semen or other DNA does not constitute ineffective assistance of counsel.

Delgado's trial counsel's decision regarding DNA evidence was a part of his trial strategy. Delgado's trial counsel was not ineffective for failing to offer favorable DNA evidence at trial, and, thus, Delgado's appellate counsel was not ineffective for failing to raise the issue on direct appeal.

## VI. CONCLUSION

For the reasons set forth above, we affirm the judgment of the district court.

AFFIRMED.